**OHIO EDISON COMPANY, Plaintiff,**

v.

**OHIO EDISON JOINT COUNCIL and Local Union No. 457 of the Utility Workers of America Union AFL/CIO, Defendants.**

No. 5:90CV0715.

United States District Court,
N.D. Ohio, E.D.

Oct. 24, 1990.

On Motion For Stay Jan. 16, 1991.

Gregory P. Szuter, Schwartz, Einhart, Wood & Szuter, Cleveland, Ohio, and Gary D. Benz, Ohio Edison Co., for plaintiff.

Richard A. Abrams, Green, Haines, Sgambati, Murphy & Macala, Youngstown, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

The plaintiff, Ohio Edison Company ("Company"), has filed its complaint to vacate an arbitration award. Jurisdiction is invoked under 29 U.S.C. § 185 (§ 301 of the Labor Management Relations Act of 1947); 9 U.S.C. §§ 9, 11, 12 (Federal Arbitration Act, as amended) and 28 U.S.C. § 1331. Declaratory relief is sought under 28 U.S.C. §§ 2201–2202.

The action is brought against Ohio Edison Joint Council and Local Union No. 457 of the Utility Workers of America Union/AFL/CIO (collectively referred to as "Union"). The Company asserts, and the Collective Bargaining Agreement discloses, that the "Joint Council" is a labor organization that is recognized as the "exclusive bargaining agent for all employees of Ohio employed in collective bargaining units Edison identified in a Collective Bargaining Agreement (CBA) to which Plaintiff and Defendants are parties and which includes therein a provision for reference of certain controversies to a board of arbitration." Plaintiff adds

Joint Council is exclusive bargaining agent for Kathleen Morabeto (herein Grievant).

Complaint at paragraph 4.

The arbitration award that is the subject of this suit relates to the company's dis-charge of Kathleen Morabeto for her violation of the company's "Position on Use or Possession of Alcohol and Drugs," instituted April 1, 1985. This policy provides in pertinent part

Off-the-job illegal drug use which could adversely affect job performance, or jeopardize the safety of other employees, the public, or Company equipment is proper cause for disciplinary action up to and including termination of employment.

In preparing this case for submission to the court the parties stipulated facts. Thereafter, plaintiff company filed its motion for summary judgment. The Union has not filed a motion for summary judgment. Rather, in its first brief, the Union observes that it has filed "a counterclaim to enforce the award," that "the parties entered into Stipulations of Fact" and that "the cause is now before the Court for a decision on the merits." The Court will now determine, on the stipulated facts, whether the plaintiff company has shown, as a matter of law, that the arbitration award should be vacated.

## I.

### A.

The facts as asserted by the company are not disputed by the Union and are accepted. Grievant worked as a stock tender in the warehouse at the Ohio Edison Sammis Plant in Stratton, Ohio. Stratton is near Steubenville, Ohio. Not disputed by the Union, these facts are asserted by the company:

In 1987, Grievant was absent from work for approximately four months due to a nonwork related injury. (Tr. 10) Grievant contacted her supervisor, Jake Reeves, in June of 1987, to inform him that she had been released for full duty by her physician and she was ready to return to work. (Tr. 10) Reeves in turn informed the personnel coordinator, Ralph Smith, of this fact. (Tr. 10)

According to routine company practice, Grievant underwent a return-to-work physical which included a drug screen/urinalysis.[3] (Tr. 10–11) The pur-

pose of a drug screen is to determine the type of medication, if any, any employee is on as well as whether there has been illegal drug use in order to determine fitness for duty. (Tr. 9–10)

_____

[3] Neither the Company's right to insist on the return-to-work physical in 1987 nor the drug screen portion of that physical were at issue before *any* arbitration panel.

Grievant's return-to-work physical was completed on June 26, 1987. The test results revealed the presence of cannabinoids (marijuana) and amphetamines. Grievant tested positive for cannabinoids at a level in excess of one-hundred (100) nanograms, a level at which impairment was determined. (Tr. 116)

Charles Anderson, Superintendent over Grievant's portion of the plant, contacted Paul Hackett, then Union President, by phone and informed him of the test results and told him that it was a "serious" situation and that Grievant was in violation of the drug and alcohol policy stating that it could lead up to discharge. (Tr. 97–98) A meeting was set up to discuss the violation and its consequences.

A meeting took place on July 9, 1987, between Anderson, Hackett and Grievant. Such meeting is the first step in discharge grievance cases (SX VI § 2). Grievant admitted using marijuana and did not contest the test results. (Tr. 99, 136–137) Anderson informed Grievant that she was being suspended pending further investigation and that the suspension could lead up to and include discharge because she was in violation of the company drug and alcohol policy. (Tr. 99)

The Union and Grievant thereafter proposed entering into a "Last Chance Agreement." This was to save Grievant's job instead of, as Local President Hackett put it, "going through a lengthy grievance procedure and possible arbitration." (Tr. 110–111) Hackett admits that the last chance agreement was his idea and that he did not have to propose it. (Tr. 59–60, 110–111, 115) Last Chance Agreements have been a method used by the Company and Union repeatedly in like situations (attachment to SX E). It is even part of the parties jargon. (Tr. 60, 62)

Apparently, during the first meeting with Anderson, Hackett asked for a break and spoke privately with Grievant. Hackett testified he told Grievant that the situation was serious and that she might be discharged. Hackett asked Grievant whether she would be willing to do something to avoid termination such as a Last Chance Agreement to save her job and Grievant said yes. (Tr. 101) The specific terms of the agreement were negotiated between Anderson, Hackett and Grievant. (Tr. 61, 100–102)

Pl.'s Br.Supp.Summ.J. at 6–8.

The Last Chance Agreement, as finally agreed on, July 17, 1987, states:

Dear Ms. Morabeto:

On June 26, 1987, you were administered a return-to-work physical, and the results of that physical indicated a positive test result for Cannabinoids. This test result indicated you were in violation of the Company Position on Use or Possession of Alcohol and Drugs. You were placed on indefinite suspension, without pay, pending further investigation effective June 29, 1987. The results of the investigation revealed that you did violate Company policy pertaining to the use of illegal drugs, and that termination of your employment is warranted.

In lieu of termination, it is agreed that:

1) Your suspension, beginning June 29, 1987, would remain in effect until evidence is received that illegal drugs no longer remain in your system, and that you meet the Company's fitness for duty requirements. This suspension will last up to thirty (30) calendar days and if the Company has not received test results showing you free of illegal drugs by the 30th day, this would be considered the termination of your employment.

2) You will avail yourself to Employee Special Services and agree to follow any and all recommendations they may have.

Employee Special Services will provide to the parties a letter stating all recommendations to be followed. Employee Special Services will have permission to provide the parties information required to properly verify that all recommendations are being followed.

3) You will be subject to a random medical examination by a doctor selected by the Company, including diagnostic tests for alcohol and drugs. If use of alcohol or unauthorized drugs is substantiated, either outside or inside the work place, it shall be considered a violation of this agreement.

4) In addition to the random examination referenced above, you are subject to the provisions outlined in the Company Position on Use or Possession of Alcohol and Drugs which was posted in the plant on April 1, 1985.

5) If you fail to meet the obligations set forth herein, you will be discharged. By your signature below, you and your Union Representative agree to these conditions and they become so effective.

6) You and the Union agree that this action is specific to the circumstances of this case and shall not constitute any precedent and shall not be used in any future arbitration or for any other purpose.

> Very truly yours,
> C.E. Anderson
> Superintendent
> W.H. Sammis Plant, Units 5–7

Complaint, Exhibit D.

Continuing the asserted facts:

Following the terms of the agreement, Grievant was reemployed after she produced a negative test result (end of July 1987). Also, per the agreement, Grievant availed herself to the ESS for six months (June 1987 to January 1988). (Tr. 125–126)

She and the Union agreed to random drug screens. The number or time limit for the random drug test was left open to negotiation at a later date. (Tr. 89) Grievant took three of these tests in the following year. She never filed a grievance protesting them. (Tr. 140) It was the third agreed test, taken in June 1988, that produced a positive result.

Pl.'s Br.Supp.Summ.J. at 11.

The undisputed relevant events of 1988, out of which grows the grievance and arbitration which is the subject of this lawsuit, are thus recited by the Company:

Grievant was scheduled for her third random drug screen on Monday, June 20, 1988. On that Monday, Grievant signed a requisition form consenting to a urinalysis as she had done twice before. On June 30, 1988, Personnel Coordinator Smith was notified that Grievant tested positive for marijuana and amphetamines. Just as with the 1987 test, the marijuana level was [in] excess of one-hundred nanograms, a level at which impairment was determined. (SX 116) Smith subsequently received the original test reports, the confirming reports, the employee consent form signed by Grievant, and the chain of custody report indicating the specimen had been properly handled and transferred. (Tr. 15, 18) Smith then notified Anderson of the results and gave him all of the paperwork concerning the test. Anderson then contacted Reeves and informed him that Grievant should be suspended pending investigation of her apparent violation of the last chance agreement. (Tr. 18, 19)

Reeves informed Bob Hicks, a Union officer, of the test results and of his intent to suspend Grievant. A meeting was held the same day the reports were received. June 30, 1988, Smith, Reeves, Hicks and Grievant were attending. Grievant was told she was being suspended for testing positive on June 20, 1988 for cannabinoids (marijuana). Grievant neither denied using marijuana nor contested the validity of the test results at this meeting. (Tr. 46–47, 75)

On July 5, 1988, Anderson held an investigative meeting with Grievant and her Union representatives. (Tr. 73) The purpose of the meeting was to review the results of the test and to ascertain any

information or explanation of why the test was positive. At the meeting, Grievant *admitted using* marijuana and *admitted she violated* the Last Chance Agreement. (Tr. 73) She *admitted* she made a mistake and wanted further consideration. (Tr. 74) According to Anderson, Grievant even asked for *another* Last Chance Agreement with a longer term random drug testing requirement. (Tr. 74–76)

After reviewing the facts, Anderson met with Grievant and her Union representative, on July 8, 1988, and informed them that in view of the explicit terms of the Last Chance Agreement and Grievant's admitted violation of the agreement, Grievant was being discharged. This meeting was the first step of the grievance procedure because of the nature of the meeting and the relief requested by Grievant. (Tr. 77)

Pursuant to the Collective Bargaining Agreement, further grievance meetings were held at which Anderson was present.... The Union never questioned the Company's right to discharge Grievant. It asked only that the Company, despite Grievant's admitted violation of the Last Chance Agreement, give Grievant *one more* last chance. (Tr. 76–77)

By the final step of grievance meetings, no change was made in the Company's decision. Accordingly, the matter proceeded to an arbitration hearing on January 23, 1990. At the arbitration, the Union never contested that fact that Grievant used marijuana or the validity of the agreement nor did it question the validity of the test results. (Tr. 99, 113–114) Furthermore, the Union never contested the fact that Grievant violated the last chance agreement. (Tr. 113–114) The Union made no argument at the arbitration contesting the validity of the last chance agreement itself (see Union opening statement, Tr. 90–92).

. . . .

As in the grievance procedure, the only argument made by the Union and Grievant was that Grievant should get another last chance. (Tr. 74, 77)

Pl.'s Br.Supp.Summ.J. at 11–14.

### B.

Lewis R. Amis, Chairman of the Arbitration Board, joined by the Union's member, entered the Board's Opinion and Award on April 6, 1990. In the Majority's "Discussion and Findings" the Panel first "set aside" the "Union's plea to allow the grievant's post-discharge rehabilitation as a factor mitigating her termination." The Panel then took up the Company's "attempt[ ] to make this a simple matter of a violation of a last chance agreement, which violation in itself defines good and sufficient reason for discharge."

> There being no dispute over the grievant's use of marijuana either in 1987 or 1988, the Company contends that the matter is closed on the basis of the fifth paragraph of the July 17, 1987, agreement which states that the grievant's failure to meet the obligations imposed therein will result in her discharge.

Opinion and Award, April 6, 1990.

The Panel next distinguished the *Myler* award, grievance no. HRIR 87–SA–3–2, the discharge of Robert A. Myler. The Company had cited *Myler* in support of its argument. The Panel summarized *Myler* as follows:

> [T]he Panel under the chairmanship of Arbitrator George W. Van Pelt, ruled that a violation of a similarly worded last chance agreement was, in and of itself, good and sufficient reason for discharge. After determining that the grievant did violate his last chance agreement, and finding no fault with the agreement, itself, the arbitration panel upheld the discharge, stating that under the circumstances it had no discretion to mitigate the penalty.

Opinion and Award, April 6, 1990.

Before quoting the rest of the Panel's opinion, certain arguments of the parties relating to the July 17, 1987 Last Chance Agreement need to be examined. The Company argues

In precis, Ohio Edison submits that a last chance agreement is a collectively bargained settlement of a grievance or potential grievance. As it is collectively bargained, its terms are a modification or an application of the terms of the collective bargaining agreement to a specific individual. It is a bilateral interpretation of that person's rights under the Collective Bargaining Agreement and so constitutes in every way a Section 301 contract that is a novation of the Collective Bargaining Agreement as to that person. Pl.'s Br.Supp.Summ.J. at 23. Challenging the argument that the letter agreement is a "modification" or a "novation" of the CBA, the defendants note that "the Ohio Edison Joint Council was not a party to the letter agreement." Defs.' Reply Br. at 2–3. Defendants argue

> If the collective bargaining agreement was to be modified, the Joint Council would have to be a party to any modification. The Joint Council was not a party to the letter agreement and the letter cannot be treated as a modification of the collective bargaining agreement. The provisions of the collective bargaining agreement remained in full force and effect and were not altered, modified, or affected in any way by the letter agreement.

*Id.* at 3.

The Panel declared that, "last chance agreements will stand up in arbitration if they are compatible with the collective bargaining agreement...." The Panel had the jurisdiction to construe the collective bargaining agreement and to determine, if it is so, that the Local Union did not have the authority to enter the Last Chance Agreement. It did not make that determination. Rather, the Panel ruled that grievant and her union representative "are not bound by [the letter] because it is a flawed document that would require them to waive basic rights under the collective bargaining agreement, and that they may not do." While the Panel had the jurisdiction to interpret the CBA as to the authority of the Local Union to enter the Last Chance Agreement, obversely, it is concluded that this court lacks such jurisdiction.

It is essential to ongoing collective bargaining between the parties to determine whether, without the participation of the Joint Council, Local 457 or any of the three other local unions has authority to resolve a grievance by a last chance agreement. But since determination of that question would not bear on this court's ultimate ruling, the question will not be remanded to the Arbitration Board for decision.

### C.

Without mentioning the language in the July 17, 1987 Last Chance Agreement, and without citing any support, the Panel prescribed the following standards under which a last chance agreement is to be judged:

> Generally, last chance agreements will stand up in arbitration if they are compatible with the collective bargaining agreement and existing Company rules and policies. A last chance agreement to be valid must be based in circumstances that otherwise would warrant an employee's discharge. That, after all, is what the agreement is all about—giving an employee who faces discharge one more chance. The conditions of the agreement may be rigorous, but they should not be unreasonably harsh or burdensome. Finally, any event triggering a violation of the agreement must be related to the original offense, though in itself it need not be cause for discharge. If a last chance agreement meets these standards a showing of a violation of the agreement ordinarily should be considered cause for discharge.

The Company's letter of July 17, 1987, unlike the agreement in the Myler case, fails to meet the above standards. It is based on the unwarranted assumption that the grievant's positive test for what the record suggests is no more than casual marijuana use off the job was good and sufficient reason for discharge, and in paragraph 3, it improperly allows the Company to test the grievant for drugs or alcohol at any time and for as long in the future as it pleases. This is an un-

reasonably harsh and burdensome condition, and with respect to alcohol, it has no relation to the original charge. The Myler Agreement, on the other hand, grew out of a situation in which Myler's drinking clearly presented a hazard to himself and others; it contained a reasonable limit of one year during which random testing for alcohol use, only, was allowed; and it was enforced only after the Company acquired a mass of evidence that Myler was continuing to abuse alcohol and was gratuitously ignoring his promise to reform. In that case, the substance and the administration of the last chance agreement were such that, given Myler's behavior, the arbitration panel had no need to look beyond his agreement to find good and sufficient reason for discharge. In this case, the substance and administration of the last chance agreement do not meet the necessary standards for a finding that the Company had good and sufficient reason to discharge the grievant for violating it. Even though the grievant and her Union representative signed the July 17, 1987, letter, they are not bound by it because it is a flawed document that would require them to waive basic rights under the collective bargaining agreement, and that they may not do.

Opinion and Award, April 6, 1990. The Panel held that the Company's actions "must be judged solely in the light of the collective bargaining agreement and the 1985 drug and alcohol policy." *Id.*

The Company's 1985 drug and alcohol policy states that off-the-job illegal drug use that "could adversely affect job performance, or jeopardize the safety of other employees, the public, or Company equipment" is proper cause for discipline up to discharge. The record indicates that the grievant never showed any sign of impairment while at work and never posed a threat to herself, other employees, or Company equipment as a result of smoking marijuana. Her counselor gave her a clean bill of health in January 1988, saying that she was not addicted to drugs or alcohol. Every indication is that at worst she was a casual user, despite her voluntary entry into a post-discharge rehabilitation program.

The Company's policy statement is somewhat vague and overly broad where it states that illegal off-duty drug use that *could* cause harm is forbidden on pain of discipline up to discharge. The Company, in any event, never tried to prove that there was potential for harm in the grievant's behavior in 1987 or in 1988 and it never described what that harm might have been. The Company admitted freely that her behavior, in fact, caused no harm; and the record shows that she does not have a critical job such as driving a bus or flying an airliner. Under the circumstances, assuming that the Company has a legitimate interest in controlling off-duty drug use, only the least of the appropriate disciplinary penalties should apply in this case.

*Id.*

The Panel then turned to "the Union's argument that the 1985 drug and alcohol policy is invalid because it was never negotiated, it cannot stand." *Id.*

The policy has been in effect for five years. When it installed the policy, the Company explained it to the Union (TR 96–97). The Union has never formally objected to the policy as a whole before this arbitration, and it has recognized it in the past, notably in the Myler case. The Company did unilaterally install the policy, but the Union did not take the opportunity that it had to demand negotiations. The Company's policy, therefore, must stand as written, subject, of course, to the Union's right to object to its application in specific cases and to demand that in assessing discipline under it, the Company must meet the requirements of the collective bargaining agreement.

*Id.*

The Panel concluded

As we have noted, the Company does have a legitimate interest in controlling drug use among its employees. In implementing its policies, however, it must act with concern for fitting the penalty to the offense and with greater sensitivity to due process than it has shown in this

case. The grievant's offense was a second incident of off-duty marijuana use within one year with no showing that such use in any way impaired her ability to perform her job. That does not amount to a dischargeable offense under the Company's drug and alcohol policy, and it is not good and sufficient reason for discharge under the collective bargaining agreement.

*Id.*

Finding the power under the Collective Bargaining Agreement to reduce the penalty, the Panel ruled finally

The Agreement does not specifically bar an arbitration panel from reducing the penalty of discharge to a lesser penalty; therefore, in resolution of this matter the panel rules as follows: the grievant's discharge is converted to a 10 day suspension. She is to be returned to work with her seniority fully restored; and, except for the time of her suspension, she is to be made whole for all lost wages and benefits, offset by any regular earnings or unemployment benefits she may have had during her absence.

*Id.*

## II.

### A.

■ In *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the third case in the *Steelworkers* Trilogy, the Court held

The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards.

. . . .

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

*Id.* at 596–97, 80 S.Ct. at 1360–61. The Court then circumscribed the Arbitrator's power

Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361. Quoting and relying on this *Enterprise Wheel* language, the Seventh Circuit, in *Tootsie Roll Industries, Inc. v. Local Union No. 1, Bakery, Confectionary & Tobacco Workers' International Union*, 832 F.2d 81 (7th Cir.1987), treated a last chance agreement as if it were a collective bargaining agreement. After citing Seventh Circuit cases that have applied the *Enterprise Wheel* language, the *Tootsie Roll* court held

We agree with the district court's finding that the arbitrator's conclusion that all aspects of Tootsie Roll's regular attendance policy must apply to the last chance agreement does not draw its essence from the agreement. We are convinced that in using the general attendance policy to find Fikes's absences excusable, the arbitrator based his award on a policy outside the letter agreement.

*Id.* at 83–84. *Tootsie Roll*'s treatment of a last chance agreement as a collective bargaining agreement applies in the instant case. Thus, the Panel's decision needs to be analyzed to see if it "draws its essence" from the [Last Chance Agreement].

The Last Chance Agreement, *supra* pp. 1478–79, neither expressly nor impliedly can furnish the source of these standards fashioned by the Panel:

1) The last chance agreement must be "based in circumstances that otherwise would warrant an employee's discharge,"

2) The "conditions of the agreement may be rigorous, but they should not be unreasonably harsh or burdensome,"

3) and "finally, any event triggering a violation of the agreement must be related to the original offense."

*See supra* p. 1481. Nor does the Panel cite any case law to justify these three hoops through which the Panel makes a last chance agreement jump to be valid. At least one arbitrator has ruled that a last chance agreement must be enforced as written. Arbitrator Teple, in *In re Mohawk Rubber Co.*, 47 Lab.Arb.Rep. (BNA) 1029 (1966) (Teple, Arb.), ruled

When a "last chance" understanding has been reached, another chance must rest entirely within the Company's discretion. The Arbitrator has no authority to grant another chance when it has been agreed that no further chance is expected or will be given. To disregard such an agreement might jeopardize the chance of other employees to obtain reinstatement on the same condition. The grievant made a bargain but failed to keep it.

*Id.* at 1035.[1]

The text of the July 17, 1987 last chance agreement is quite explicit, as these key paragraphs reveal:

(3) You will be subject to a random medical examination by a doctor selected by the Company, including diagnostic tests for alcohol and drugs. If use of alcohol or unauthorized drugs is substantiated, either outside or inside the work place, it shall be considered a violation of this agreement.

(4) In addition to the random examination referenced above, you are subject to the provisions outlined in the Company Position on Use or Possession of Alcohol and Drugs which was posted in the plant on April 1, 1985.

(5) If you fail to meet the obligations set forth herein, you will be discharged. By your signature below, you and your Union Representative agree to these conditions and they become so effective.

Opinion and Award, April 16, 1990.

After setting up standards for evaluating a last chance agreement, the Panel then used those unfounded standards to strike down the July 17, 1987 Last Chance Agreement. The Panel thus concluded:

In this case, the substance and administration of the last chance agreement do not meet the necessary standards for a finding that the Company had good and sufficient reason to discharge the grievant for violating it. Even though the grievant and her Union representative signed the July 17, 1987, letter, they are not bound by it because it is a flawed document that would require them to waive basic rights under the collective bargaining agreement, and that they may not do.

*Id.* at 6. Thus, the Panel did not draw its decision from the essence of the July 17, 1987, Last Chance Agreement. Instead, the Panel found it was "flawed" and not binding on the grievant and her Union representative. This ruling conflicts with the holding of *Tootsie Roll*.

Relied on heavily by the Company, *Bakers Union Factory, No. 326 v. ITT Continental Baking Co.*, 749 F.2d 350 (6th Cir. 1984), holds that an arbitrator is "bound by the terms of a written settlement agreement" unless it is "overcome by a contrary, unambiguous provision in the parties collective bargaining agreement." *Id.* at 356.

Initially, we embrace a presumption that parties who reach a settlement pursuant to the terms of a collective bargaining agreement do not intend that an arbitrator may amend the terms of the settlement agreement. This presumption is well supported by reason and precedent. As the Company points out, the district court's ruling that an arbitra-

---

**1.** Cited in *Bakers Union Factory, No. 326 v. ITT Continental Baking Co.*, 749 F.2d 350, 352–53 (6th Cir.1984).

tor is not bound to enforce the parties' prior settlement agreement undermines the viability of a system that seeks to encourage settlements reached without the aid of an arbitrator. If the district court's view were to prevail, a party who became unhappy with a settlement agreement would have every incentive to breach the agreement and then submit the controversy to an arbitrator. That is precisely what happened here. The result of such a scheme would be the erosion of the mutual trust that is necessary to reach settlement agreements....

*Id.* at 354. The Court later concluded:

Although we conclude that an arbitrator is presumptively bound by the terms of a written settlement agreement, that presumption may be overcome by a contrary, unambiguous provision in the parties' collective bargaining agreement. No such contrary provision is present in the record before us.

*Id.* at 356. If *Bakers Union* were Sixth Circuit authority that is pertinent and controlling, it would be relevant that the 1986–1989 collective bargaining agreement in the instant case, like that in *Bakers Union,* does not contain a provision that is "contrary" to the binding nature of a last chance agreement. Indeed, the subject of last chance agreements is not mentioned in Article VI "Hiring and Discharge of Employees" or in any other article of the CBA.

The grievant tested positively for marijuana and amphetamines on June 20, 1988, with the marijuana level in excess of one hundred nanograms per *ml,* the cut-off at which impairment was determined. Indicating "use of ... unauthorized drugs ... either outside or inside the work place," this positive test "shall be considered a violation of [the Last Chance] [A]greement." The grievant thus "fail[ed] to meet the obligations set forth [t]herein;" and for this failure the Agreement provided, "[Y]ou will be discharged."

The Panel disregarded this plain language of the Last Chance Agreement and, in effect, revised the Company's 1985 "Position on Use or Possession of Alcohol and Drugs" in several respects. The Panel deemed material that the "grievant never showed any sign of impairment while at work and never posed a threat to herself, other employees, or Company equipment as a result of smoking marijuana." Opinion and Award, April 6, 1990 at 7. The Panel assumed that the Company must "prove," and then held that it "never tried to prove, that there was potential for harm in the grievant's behavior in 1987 or in 1988, and it never described what that harm might have been." *Id.* The Panel then observed, "The Company admitted freely that her behavior, in fact, caused no harm; and the record shows that she does not have a critical job such as driving a bus or flying an airliner." *Id.* The Panel then concluded

Under the circumstances, assuming that the Company has a legitimate interest in controlling off-duty drug use, only the least of the appropriate disciplinary penalties should apply in this case.

*Id.*

Were it not for (1) *United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), which updates the application of the language of *Enterprise Wheel,* earlier quoted, and (2) post-*Misco* Sixth Circuit cases, this court would regard *Tootsie Roll* and *Bakers Union* as "last chance agreement" precedents that are pertinent and should be followed. Attention, therefore, turns to *Misco* and the post-*Misco* Sixth Circuit cases.

**B.**

To the extent the factual background of *Misco* needs reviewing, the Court held, in pertinent part:

The Company's position, simply put is that the arbitrator committed grievous error in finding that the evidence was insufficient to prove that Cooper had possessed or used marijuana on company property. But the Court of Appeals, although it took a distinctly jaundiced view of the arbitrator's decision in this regard, was not free to refuse enforcement because it considered Cooper's presence in the white Cutlass, in the circumstances,

to be ample proof that Rule II.1 was violated. No dishonesty is alleged; only improvident, even silly, factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.

*Id.* at 39, 108 S.Ct. at 371.

Particularly pertinent to the instant case is the Court's application of *Enterprise Wheel* to the facts of *Misco.*

Even if it were open to the Court of Appeals to have found a violation of Rule II.1 because of the marijuana found in Cooper's car, the question remains whether the court could properly set aside the award because in its view discharge was the correct remedy. Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In *Enterprise Wheel,* for example, the arbitrator reduced the discipline from discharge to a 10–day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies.*" 363 U.S., at 597 [80 S.Ct. at 1361] (emphasis added).

*Misco,* 484 U.S. at 41, 108 S.Ct. at 372.

In present context, the Court's ruling means that even though the Last Chance Agreement unequivocally calls for the grievant's discharge for her June 20, 1988 positive marijuana test, the Panel was authorized "to bring [its] informed judgment to bear in order to reach a fair solution of a problem." "[E]specially true when it comes to formulating remedies," the Panel was empowered, the Court is saying, to order a 10–day suspension instead of discharge. Indeed, in *Misco* the Court noted that in *Enterprise Wheel* it had upheld the Arbitrator's reduction of the "discipline from discharge to a 10–day suspension."

In *Eberhard Foods, Inc. v. Handy,* 868 F.2d 890, 891 (6th Cir.1989), the Court of Appeals observed that in *Misco,* "the Court

again advised lower federal courts to be more deferential to the arbitration process". In *Eberhard Foods,* two employees (Handy and Summa) were involved in an argument while playing cards.

When Summa threw playing cards at Handy, Handy twice hit Summa in the face. Both employees were suspended with pay pending investigation of the matter.

As a result of the investigation, Eberhard determined that Handy had violated Rule 13 of the Work Rules and Regulations ("Rules") agreed to by the Union and the employer. Specifically, Rule 13 provides that an employee who was guilty of fighting on company time or property was subject to discharge for the first offense. Eberhard, on the other hand, found that Summa had not violated Rule 13. Eberhard, therefore, discharged Handy and reinstated Summa without loss of time.

*Id.* at 890–91.

Accordingly, the Court of Appeals ruled

Although the case is a close one, we believe that the policy set forth by the Supreme Court in *Misco* is dispositive here. We further believe that for the reasons stated above, the arbitrator's action was in line with that policy. We, therefore, reverse the decision of the District Court and remand the case with instructions to reinstate the arbitrator's award.

*Id.* at 893.

The similarity between *Eberhard* and the instant case is evident. In *Eberhard,* Work Rule 13 provided that an employee who was guilty of fighting on company time or property was subject to discharge for the first offense. Similarly, in the instant case the July 17, 1987 Last Chance Agreement, as seen, empowered the Company to discharge the grievant if she violated the Agreement, as she in fact did. The CBA in *Eberhard* made no reference to the Work Rules. In the instant case the CBA makes no reference to last chance agreements. In the CBA in *Eberhard* the right to discharge for cause was lodged within the sole discretion of the employer; but

that CBA's Article VII, Section 1 further provided that the employer may not discharge a non-probationary employee without "just cause." This was the "lack of clarity" on the issue of sanctions to which the Court of Appeals refers. In contrast, the CBA in the instant case provides that "before an employee in the bargaining unit is discharged" the Company will "discuss the matter of discharge with an officer of the Union Local," and "No employee shall be discharged or suspended except for good and sufficient reasons." 1986–1987 Agreement, Article VI, Sections 2, 4.

Thus, exercising deference "to the arbitration process" which *Misco* counsels,[2] and which *Eberhard* recognizes, and because *Eberhard's* similarity to the instant case makes it a controlling precedent, this court determines that the Panel had the authority to mitigate the grievant's penalty from discharge to a 10–day suspension.

Upon the above grounds this court, as a matter of law, denies the Company's motion for summary judgment to vacate the Panel's award. Obversely, the court grants the Union's counterclaim to enforce the award.

IT IS SO ORDERED.

## ON MOTION FOR STAY

██ Plaintiff Ohio Edison Company on November 13, 1990 moved for an order to stay[1] "execution of or any proceedings to enforce the judgement entered in favor of Defendants herein on October 24, 1990, pending the hearing and determining of Plaintiff's Appeal to the United States Court of Appeals for the Sixth Circuit." Plaintiff makes its motion pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, which accords a court denying an injunction the discretion to "grant an in-

junction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party."

### A.

Plaintiff Ohio Edison recognizes that the criteria applicable in granting a stay are the same as those applied under Rule 65 for determining whether to grant a preliminary injunction. Plaintiff lists four criteria:

1. Plaintiff is likely to succeed on the merits;
2. Plaintiff will suffer irreparable injury if the stay is not granted;
3. Defendants will not suffer substantial harm if the stay is granted;
4. A stay pending appeal would be in the public interest. (*Hilton v. Braunskill* (1987), 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724.)

Pl.'s Mem.Supp. Mot. to Stay at 3.

The Union defendants also cite *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987), which states that "the factors regulating the issuance of a stay are generally the same" under both Fed.R.Civ.P. 62(c) and Fed.R.App.P. 8(a). These factors are:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

481 U.S. at 776, 107 S.Ct. at 2119.

The Union defendants rely on *Dewey v. Reynolds Metals Co.*,[2] 304 F.Supp. 1116 (W.D.Mich.1969), in which they say, "[T]he court stayed the back pay portion of the

---

**2.** In the recent case of *Interstate Brands Corp. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135*, 909 F.2d 885 (6th Cir.1990), as in *Eberhard*, guided by *Misco*, the Court of Appeals reversed a district court's vacation of an arbitration award.

**1.** On the same day plaintiff Ohio Edison filed its Notice of Appeal to the Sixth Circuit.

**2.** The district court refused to stay its order reinstating Dewey because it found "that defendant would suffer no 'undue hardship,' under the Equal Employment Opportunity Commission guidelines, by accommodating the religious beliefs of Mr. Dewey" and because it was "convinced that the only party to be irreparably harmed by a stay of this judgment would be plaintiff." *Dewey*, 304 F.Supp. at 1119.

[Title VII religious discrimination] award, but held that the employer was not entitled to a stay of the reinstatement remedy ordered by the court." Defs.' Mem.Opp'n Mot. to Stay at 5. As to whether defendant has made a "strong showing that it is likely to succeed on the merits of the appeal," the district court in *Dewey* stated only that defendant Reynolds "sought merely to reargue its case." *Dewey*, 304 F.Supp. at 1119. As it will be shown, *infra*, the plaintiff Ohio Edison has done more than "merely reargue its case" in its motion for stay pending appeal.

Plaintiff submits:

in no way has *Bakers' [Union Factory, No. 326 v. ITT Continental Baking Co., Inc.*, 749 F.2d 350 (6th Cir.1984)] been abrogated by [*United Paperworkers Int'l Union v.]Misco[*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)] or the subsequent Sixth Circuit decisions applying *Misco*. In fact, *Bakers'* is entirely consistent with *Misco* and is thus still good law. *Misco* calls for judicial deference to arbitral findings of fact and interpretation of contracts. *Bakers* calls for arbitrator's deference to agreements of the parties.... Moreover other courts have found *Bakers'* reasoning viable even after *Misco* to wit *Tootsie Roll Indus. v. Local Union No. 1* (CA7, 1987), 832 F.2d 81 and *Northwest Airlines v. Machinists* (CA8, 1990), 894 F.2d 998.

Pl.'s Mem.Supp.Mot. to Stay at 5.

A Sixth Circuit district court decision, more recent than *Dewey*, is more helpful in explaining the requirement of the first factor of *Hilton*. *C.B.S. Employees Federal Credit Union v. Donaldson, Lufkin & Jenrette Securities Corp.*, 716 F.Supp. 307 (W.D.Tenn.1989), sensibly translates, and practically applies, the first factor of *Hilton*.

In applying the first prong of the *Hilton* test to the present case, it is unlikely that a district court would ever be able to find that defendants will be likely to succeed on the merits of their appeal. To make such a finding, the district court would be saying that it erred in not granting defendant's original motion to stay the proceedings pending arbitration, and that the court of appeals is likely to reverse its decision. This Court is not prepared to make such a statement and does not feel that it must in order to satisfy the first prong of the *Hilton* test. In *Washington Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977), the court stated:

A court, when confronted with a case in which the other three factors strongly favor interim relief, may exercise its discretion to grant a stay if the movant has made a substantial case on the merits. The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits.

559 F.2d at 843. The *Washington Area Transit* court went on to state that the first prong of the test is satisfied when the movant presents a "serious legal question," regardless whether he has shown a mathematical probability of success. *Id.* at 844.

716 F.Supp. at 309–10.

Senior District Judge McRae then held as to the first factor:

Though this Court is confident that it correctly denied defendants' motion to stay proceedings pending arbitration, the Court notes that defendants' appeal does address serious legal questions. Therefore the Court finds that defendants have satisfied the first prong of the *Hilton* test.

*Id.* at 310.

At an oral hearing on December 13, 1990, the plaintiff called as a witness Guy Pipitone, General Plant Superintendent of the Ohio Edison Sammis Plant at the time of Ms. Kathleen Morabeto's dismissal;[3] and the defendants called as witnesses grievant Kathleen Morabeto, James J. Keenan, a mechanic at Ohio Edison Sammis Plant and President of Utility Workers Local No. 457,

---

**3.** Mr. Pipitone is now Manager of the Sammis Plant.

and Lloyd W. Overly, Chairman of the Joint Council. Upon the testimony presented by these witnesses, oral argument of counsel, the briefs of counsel and applicable law, the plaintiff's motion for a stay is now decided.

### B.

This court first takes up the colliding contentions as to the first factor. Plaintiff argues that "[p]laintiff is likely to succeed on the merits," and defendants insist that "[t]he company has not shown a likelihood of success on the merits of its appeal." In determining whether the plaintiff establishes the first factor, this court adopts and applies Judge McRae's translation and application of the first *Hilton* factor in *CBS Employees.* Thus, this court considers whether the plaintiff presents any " 'serious legal question' " for appeal. *C.B.S. Employees,* 716 F.Supp. at 310.

In its Memorandum and Order of October 24, 1990, this court reported that on July 17, 1987 Kathleen Morabeto, Local Union 457 and Ohio Edison agreed and signed a Last Chance Agreement. This agreement recognizes that a return to work physical "indicated a positive test result for Cannabinoids," that this violated "[c]ompany policy pertaining to the use of illegal drugs," that she was "subject to the provisions outlined in the Company Position on Use or Possession of Alcohol and Drugs which was posted in the plant on April 1, 1985," and that she and the Union agreed that if she "fail[ed] to meet the obligations set forth herein, [she] will be discharged." July 17, 1987 Last Chance Agreement.

On June 20, 1988, in a further random drug screen test, Kathleen Morabeto, the grievant, "tested positive for marijuana and amphetamines.... [T]he marijuana level was [in] excess of one-hundred nanograms, a level at which impairment was determined." *See* October 24, 1990 Memorandum and Order at 7. Referring to the Last Chance Agreement in its Memorandum and Order at 21, this court concluded:

The Panel disregarded this plain language of the Last Chance Agreement and, in effect, revised the Company's 1985 "Position on Use or Possession of Alcohol and Drugs" in several respects. The Panel deemed material that the "grievant never showed any sign of impairment while at work and never posed a threat to herself, other employees, or Company equipment as a result of smoking marijuana." Opinion and Award, April 6, 1990 at 7. The Panel assumed that the Company must "prove," and then held that it "never tried to prove, that there was potential for harm in the grievant's behavior in 1987 or in 1988, and it never described what that harm might have been." *Id.* The Panel then observed, "The Company admitted freely that her behavior, in fact, caused no harm; and the record shows that she does not have a critical job such as driving a bus or flying an airliner." *Id.* The Panel then concluded

> Under the circumstances, assuming that the Company has a legitimate interest in controlling off-duty drug use, only the least of the appropriate disciplinary penalties should apply in this case.

*Id.*

October 24, 1990 Memorandum and Order at 21. This court then held

> Were it not for (1) *United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29 [108 S.Ct. 364, 98 L.Ed.2d 286] (1987), which updates the application of the language of [*United Steelworkers v.] Enterprise Wheel [ & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)], earlier quoted, and (2) post-*Misco* Sixth Circuit cases, this court would regard *Tootsie Roll [Indus. v. Local Union No. 1,* 832 F.2d 81 (7th Cir.1987)] and *Bakers Union [Factory, No. 326 v. ITT Continental Baking Co.,* 749 F.2d 350 (6th Cir.1984)] as "last chance agreement" precedents that are pertinent and should be followed.

*Id.* at 21–22. This and other holdings of this court in its Memorandum and Order raise serious questions of law for appeal because, as the court ruled, the "Panel did not draw its decision from the essence of

the July 17, 1987, Last Chance Agreement." *Id.* at 19. Serious questions of law arise. Whether the arbitration Panel, without express or implied authority, may decide that the validity of a last chance agreement, depends on these self-drawn standards:

1.) The last chance agreement must be "based in circumstances that otherwise would warrant and employee's discharge,"

2.) The "conditions of the agreement may be rigorous, but they should not be unreasonably harsh or burdensome,"

3.) and "finally, any event triggering a violation of the agreement must be related to the original offense."

*Id.* at 17 (quoting April 6, 1990 Opinion and Award). Having created its own standards for testing the validity of a last chance agreement, may an arbitration panel apply these standards to modify a last chance agreement that expressly provides, as here, for discharge "if use of ... unauthorized drugs is substantiated, either outside or inside the workplace?" *See id.* at 6. More specifically, may an arbitration panel disregard the explicit discharge requirement in the Last Chance Agreement and hold that "only the least of the appropriate disciplinary penalties should apply in this case [10 days suspension]." *See id.* at 21. At the December 13, 1990 hearing Plant Manager Pipitone was asked:

Q. Mr. Pipitone, just talking generally, how does enforcement of the court's award and the arbitration decision during this interim period impact on the company's ability to negotiate and deal with the union?

He indicated this "impact ... in reconciling differences in the workplace in the future:"

A. We certainly have to be very apprehensive in our dealings when we have come to an agreement through deliberations, through discussions, involving a lot of supervisory and union leadership, personnel's time, wherein an agreement—everyone involved has signed an agreement, yet it can be overturned, that has to make us very apprehensive in those discussions, and certainly impact what we are able or felt we were able to do in reconciling differences in the workplace in the future.

This court noted in its opinion, *"Bakers Union Factory No. 326 v. ITT Continental Baking Co.,* 749 F.2d 350 (6th Cir.1984), holds that an arbitrator is 'bound by the terms of a written settlement agreement' [last chance agreement] unless it is 'overcome by a contrary, unambiguous provision in the parties collective bargaining agreement.'" October 24, 1990 Memorandum and Order at 19. This court observed:

If *Bakers Union* were Sixth Circuit authority that is pertinent and controlling, it would be relevant that the 1986–1989 collective bargaining agreement in the instant case, like that in *Bakers Union,* does not contain a provision that is "contrary" to the binding nature of a last chance agreement. Indeed, the subject of last chance agreements is not mentioned in Article VI "Hiring and Discharge of Employees" or in any other article of the CBA.

*Id.* at 20. Given this continuing Sixth Circuit Authority that recognizes the validity of last chance agreements, a serious legal question therefore arises whether *Bakers Union* represents pertinent Sixth Circuit authority that governs the present case. This serious question exists even though this court determined that *Bakers Union* is not controlling. Rather this court finally held:

[E]xercising deference "to the arbitration process" which *Misco* counsels [2], and *Eberhard [Foods, Inc. v. Handy,* 868 F.2d 890 (6th Cir.1989)] recognizes, and because *Eberhard's* similarity to the instant case makes it a controlling precedent, this court determines that the Panel had the authority to mitigate the grievant's penalty from discharge to a 10–day suspension.

Upon the above grounds this court, as a matter of law, denies the Company's motion for summary judgment to vacate the Panel's award. Obversely, the court

grants the Union's counterclaim to enforce the award.

. . . .

2 In the recent case of *Interstate Brands Corp. v. Chauffeurs, Teamsters Warehousemen and Helpers Local Union No. 135,* 909 F.2d 885 (6th Cir.1990), as in *Eberhard,* guided by *Misco,* the Court of Appeals reversed a district court's vacation of an arbitration award.

October 24, 1990 Memorandum and Order at 25.

Accordingly, the first factor to warrant a stay of this court's judgment upholding the arbitration panel's order of reinstatement is established by the plaintiff.

### C.

The second *Hilton* factor to be considered is "whether the applicant will be irreparably injured absent a stay." 481 U.S. at 776, 107 S.Ct. at 2119. Applied to this case, this factor concentrates on Ohio Edison's drug and alcohol policy as instituted by the company on April 1, 1985.

Off-the-job illegal drug use which could adversely affect job performance, or jeopardize the safety of other employees, the public, or Company equipment is proper cause for disciplinary action up to and including termination of employment.

October 24, 1990 Memorandum and Order at 2.

As seen, this court specified that the Arbitration Panel, "in effect, revised the Company's 1985 'Position on Use or Possession of Alcohol and Drugs' in several respects." October 24, 1990 Memorandum and Order at 21. Seeking to enforce and preserve its drug and alcohol policy, plaintiff elicited this testimony of Plant Manager Pipitone at this court's hearing on the Company's Motion to Stay "execution to enforce the judgment....":

Q. Mr. Pipitone, given Kathleen Morabeto's history as you know it, what particular concerns would you have in reinstating her during this interim period?

A. The serious concern is that she is a known drug user, was discovered using drugs back in '87, was placed on

the last chance letter following termination, placed on last chance letter for using drugs, violated that last chance letter. And that letter certainly undermines our effort and undermines our effort to discourage the use of drugs in the plant. It's recognized that drugs—and particularly in our workplace where there is equipment that if not operated and maintained correctly is potentially dangerous, very dangerous—could cause loss if not operated and maintained correctly, loss of life could be caused. We can't have people on the property using drugs, under the influence of drugs.

Among its findings, the Arbitration Panel held

Her counselor gave her a clean bill of health in January 1988, saying that she was not addicted to drugs or alcohol. Every indication is that at worst she was a casual user, despite her voluntary entry into a post-discharge rehabilitation program.

October 24, 1990 Memorandum and Order at 13 (quoting April 6, 1990 Opinion and Award). The evidence at the hearing of December 13, 1990 reveals Ms. Morabeto has a continuing, not a "casual," problem. At the hearing of December 13, the Union defendants brought out from Kathleen Morabeto that she has not continued to use drugs; and that she would submit to a "drug screen test today." But Ms. Morabeto also testified that she continues to meet with her drug therapist. She recognizes that "cannabis dependency is an ongoing problem." She further admitted:

Q. Your addition to drugs is a daily struggle?

A. Yes

Q. Isn't it true that part of your rehabilitation process is to recognize that you will always be an addict?

A. Yes

On these frankly admitted facts, there is strong support for Ohio Edison counsel's arguments, "If we return the lady we can never go back again. If other workers see the example of this lady brought back, it is

a hole in the dike [the drug and alcohol policy]." Therefore, this court is convinced that the foregoing facts and arguments warrant a finding that Ohio Edison's maintenance of its drug and alcohol policy will be irreparably injured if this court, pending appeal, orders Kathleen Morabeto reinstated pursuant to the arbitration award. Thus, the second *Hilton* factor is established.

To support its claim of irreparable injury if a stay of Ms. Morabeto's reinstatement order is not granted, Ohio Edison asserts disruption to its work force. This court is convinced that reinstatement of Kathleen Morabeto would cause disruption to the company's management of its work force in the north electrical department to which Ms. Morabeto's replacement would likely be returned. However, the court is not convinced that such disruption would rise to the level of irreparable injury.

### D.

The third *Hilton* factor requires the court to balance the likelihood of plaintiff's irreparable injury with the Union defendants showing that they will suffer substantial injury if the stay is issued. As the Union defendants point out, *Hilton* imposes on the defendants the burden of showing that they will suffer substantial injury, a lesser burden than showing irreparable injury. Nevertheless, the court finds that any economic loss that Kathleen Morabeto may suffer if not immediately reinstated is reimbursable should the plaintiff fail to overturn the arbitration panel order of reinstatement. The possible difference in earnings is quantifiable and reimbursement may be guaranteed through an adequate supersedeas bond. *See* Fed.R.Civ.P. 62(d). As for health benefits, it appears that she is presently covered in Ohio Edison's health plan through her common law marital relationship with Thomas Abdullah. Finally, any order granting a stay should be conditioned on full protection for Kathleen's Morabeto's pension rights, when and if she is reinstated as a Ohio Edison employee.

When asked what hardship was caused by the company's refusal to reinstate her, Kathleen Morabeto answered she had "to move in with [her] sister." This change in Kathleen Morabeto's living conditions, though quite real to Ms. Morabeto, is found to be too transitory in substance to constitute a substantial injury.

As to any possible injury to Local Union 457, should reinstatement be stayed, the evidence shows no substantial injury. The grievance log reveals 23 filed in 1987, 36 filed in 1988, 38 filed in 1989, and 37 filed through November 3, 1990. Patently, the grievance procedure has not suffered from Ohio Edison's decision to appeal the Morabeto reinstatement award. Further, Local 457 President Jim Keenan testified that, because the company is appealing the arbitration award, his leadership is being questioned. He testified that things would be a lot smoother if the company never appealed the decision and that the workers would have more faith in him and have a better feeling towards the company. Given the company's right of appeal, any adverse effects on the employees' attitudes that are resulting from the company exercising its right to appeal the arbitration reinstatement award cannot, and does not, constitute substantial injury to the union defendants.

In sum, it is determined that the testimony of the union witnesses Morabeto, Keenan and Overly do not satisfy the substantial injury requirement.

### E.

The fourth and final *Hilton* factor to consider is "where the public interest lies." 481 U.S. at 776, 107 S.Ct. at 2119. As the plaintiff observes, there is great public interest in negotiated settlements of labor disputes. Last chance agreements provide one way to achieve a negotiated settlement of a labor dispute. In appealing, Ohio Edison seeks to uphold the Last Chance Agreement negotiated between Local Union 457, Kathleen Morabeto and Ohio Edison, and agreed to and signed by the parties on July 17, 1987. Doing so, the company thereby satisfies *Hilton's* fourth factor of "where the public interest lies."

As opposing proof of "where the public interest lies," the union defendants can point to this court's "exercising deference 'to the arbitration process' which *Misco* counsels." October 24, 1990 Memorandum and Order at 25. Such deference caused this court to determine that "the Panel had the authority to mitigate the grievant's penalty from discharge to a 10–day suspension." *Id.* Yet, if a court were to treat reliance on *Misco* as automatic and unassailable proof of "where the public interest lies," then an employer appealing an arbitrator's award could never obtain a motion for stay of a reinstatement order, because a contrary showing of "where the public interest lies" could not be proved. In this case, despite this court's exercise of "deference to the arbitration process," this court concludes that Ohio Edison's appeal to uphold the Last Chance Agreement as a negotiated settlement of a labor dispute is an overriding "public interest" on this appeal.

Since this court finds that Ohio Edison has satisfied each of the four *Hilton* factors essential to granting a motion to stay, this court grants the plaintiff's motion to stay. Attention is now turned to fixing a supersedeas bond.

### F.

The defendants state that, if reinstated, Ms. Morabeto is entitled to 2½ years of back pay at $30,000 per year. At the hearing, Mr. Pipitone did not dispute that Ms. Morabeto would make $10.00 more per hour if she were reinstated. Assuming her annual hours should be 2,000, it appears that her difference in earnings is $20,000 per year, or a total of $50,000. Assuming further that the appeal will last a year, this adds $20,000 more, making a total of $70,000. Allowing interest at 10% per annum adds $7,000 more. The supersedeas bond is hereby set at $80,000. It should also include the condition relating to Ms. Morabeto's pension rights.

In conformity with this opinion, plaintiff's counsel shall prepare, and after consultation with defendants' counsel, submit to the court Plaintiff's Bond for Stay Pending Appeal.

IT IS SO ORDERED.